UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| BERKSHIRE BANK <br>           Plaintiff <br><br> v. <br><br> CENTREVILLE BANK <br>           Defendant | C.A. No. 20-_____ |

## COMPLAINT

Plaintiff Berkshire Bank ("Berkshire"), by and through its undersigned attorneys, alleges as follows against Defendant Centreville Bank ("Centreville").

### Parties

1. Plaintiff Berkshire is a Massachusetts banking corporation having its principal place of business at 24 North Street, Pittsfield, Massachusetts.

2. Defendant Centreville is a Rhode Island banking corporation having its principal place of business at 1218 Main Street, West Warwick, Rhode Island.

### Jurisdiction and Venue

3. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2).

**Background**

5. On January 11, 2018, Centreville loaned to borrower Shiva, LLC ("Shiva"), a Massachusetts limited liability company located at 1850 Post Road, Warwick, Rhode Island, the amount of $11.5 million ("the Loan"), with an initial interest rate of 5.14% per year and adjustments every five years, and with a term of 10 years.

6. The Loan was evidenced by a Promissory Note payable to Centreville, a Security Agreement and a Loan Agreement, all dated January 11, 2018, detailing the representations, warranties, covenants and terms for advancing of the Loan (collectively "the Loan Documents").

7. The Loan was secured by, *inter alia*, a first mortgage on land, buildings and improvements located at 1850 Post Road, Warwick, Rhode Island, together with other personal and real property securing the Loan (collectively "Collateral"); a first collateral assignment of leases, rents, permits and licenses; and a first priority security interest in all business assets of Shiva under the Uniform Commercial Code ("UCC"). The Collateral consisted primarily of a hotel operated in close proximity to T.F. Green Airport in Warwick, Rhode Island.

8. Under the Security Agreement, Shiva agreed to grant to Centreville a security interest in Shiva's assets, owned at any time, including deposit accounts, contract rights and the like, in order to secure payment and performance of Shiva's obligations under the Loan Documents.

9. Under the Loan Agreement, the Loan is subject to several covenants including: (a) a minimum debt service coverage ratio ("DSCR") which required Shiva to maintain a minimum debt service coverage ratio of 1.25x annually, such DSCR measured as the ratio of Net Operating Income plus amortization, depreciation, and interest expense less internally funded capital expenditures, to the total debt service for Shiva and the corporate guarantor, Airport

Hospitality, LLC; and (b) a Loan to Value ("LTV") covenant that required Shiva to maintain a maximum LTV of no greater than 65% at all times, such LTV defined as the ratio of the fair market value of the Collateral property as determined by the most recent appraisal prepared for and accepted by Centreville to the outstanding principal balance of the Loan.

10. Jay Patel and Airport Hospitality, LLC, executed guarantees in favor of Centreville, unconditionally guaranteeing repayment of the Loan pursuant to the promissory note, such guarantee being in effect until the promissory note is paid in full.

11. On June 11, 2018, Savings Institute Bank & Trust Company ("SIB") entered into a Participation Purchase and Servicing Agreement ("Participation Agreement") to participate in the Loan.

12. Pursuant to the Participation Agreement, SIB purchased from Centreville a participation comprising an undivided pro rata interest in the Loan and the related Loan Documents. Specifically, SIB paid an aggregate sum of $2.5 million to participate in the Loan with a percentage interest of no less than 21.925% and no greater than 23.757%.

13. The Participation Agreement provided certain rights to SIB and imposed certain obligations on Centreville with respect to Shiva's Loan. Specifically, under Section 6 of the Participation Agreement entitled "Standard of Care; Servicing of the Loan," Centreville agreed to service the Loan in a commercially reasonable fashion and in accordance with its usual practices in the ordinary course of its business and to exercise the same care in administering the Loan and all Collateral for the Loan as it customarily exercised in similar loans in which no participation has been granted.

14. Moreover, Centreville was not permitted to give or withhold any approvals which may be required under the Loan Documents to the extent such approvals materially affected the Loan or the Collateral securing the same.

15. Centreville also agreed that it would be liable for any actions that constituted gross negligence or willful misconduct.

16. Under the Participation Agreement, Centreville also made certain representations and warranties to SIB.

17. Specifically, under Section 2(b) of the Participation Agreement, Centreville represented and warranted that it "has no 'Actual Knowledge' (which shall mean actual knowledge of any officer of Lender-Servicer [Centreville] having responsibility for the Loan) that any default or event of default under any of the Loan Documents, including the Notes ('Event of Default'), or event or condition which upon notice or passage of time or both could become an Event of Default ('Default Condition'), has occurred and is continuing on the date hereof."

18. Further, under Section 2(e) of the Participation Agreement, Centreville represented and warranted that it would "take all reasonable actions necessary to effect and maintain the perfection and the priority of all liens and security interests granted in the Collateral as security for each of the Loan."

19. The Participation Agreement also obligated Centreville promptly to provide certain critical information to SIB. Specifically, under Section 7 of the Participation Agreement, Centreville was required to promptly furnish to SIB accurate copies of all material notices given or received by it pursuant to the Loan Documents and upon Centreville's acquisition of actual knowledge thereof, written notice of the following: (a) any material adverse change in Shiva or

any Guarantors' financial condition; (b) any change in the perfection or priority of any lien on the Collateral securing the Loan; (c) any material change in the value of the Collateral including any material casualty with respect thereto; (d) the occurrence of a Material Event of Default or a Material Default Condition; and (e) any request by Shiva, or any Guarantors, to request a Material Change.

20. For purposes of the Participation Agreement, a "Material Event of Default" or a "Material Default Condition" meant an Event of Default or Default Condition (as these terms are defined in Section 2) which in the reasonable judgment of Centreville is an event which (a) has a material adverse effect on the financial condition of Shiva; or (b) is of such a nature that Centreville reasonably determines that action on its part is necessary to protect its retained interest in the Loan, and SIB's participation in the Loan, the Loan Documents, and/or the Collateral.

21. Moreover, under Section 13 of the Participation Agreement entitled "Notice of Material Events of Default; Exercise of Remedies," in the event that Centreville acquired actual knowledge of the occurrence of a Material Event of Default or a Material Default Condition, Centerville was required to notify SIB in writing thereof as soon as is reasonably practical after Centreville acquired such knowledge.

22. Centreville was also obligated to provide to SIB, as soon as reasonably practical, complete and current credit information in Centreville's possession as to accrual status of the Loan, status of principal and interest payments, Collateral values, lien status and any factual information bearing on the continued creditworthiness of Shiva or any Guarantors of the Loan.

23. Under Section 12 of the Participation Agreement, Centreville Bank was prohibited from making any change relative to the Loan, without the prior written consent of

SIB, to modify or amend any material financial covenants or negative covenants set forth in the Loan Documents.

24.     Lastly, under Section 11 of the Participation Agreement, Centreville expressly agreed that it would repurchase from SIB its percentage of any outstanding principal and interest and late charges for the Loan in the event of a loss due to fraud or gross negligence on Centreville's part, its servants, agents or employees.

25.     On or about May 17, 2019, SIB merged into Berkshire Bank, and Berkshire Bank succeeded to the rights of SIB under the Participation Agreement.

26.     Centerville has breached Sections 2(b), 2(e), 6 and 12(f) of the Participation Agreement, failed to act in a commercially reasonable fashion and was grossly negligent by: (a) allowing the revocation of Shiva's authority with the Rhode Island Secretary of State and permitting, but failing to notify Berkshire of, the "roll up" of Shiva into the corporate guarantor, Airport Hospitality LLC; (b) failing to file a UCC-1 against the corporate guarantor such that Berkshire no longer has a perfected security interest in any of the Guarantor's non-real estate assets; (c) failing to disclose to Berkshire that an Event of Default existed and was continuing as of the date of the Participation Agreement, (d) waiving material adverse changes, Material Events of Default and Material Default Conditions by permanently agreeing to a waiver of the June 30th testing of the DSCR and permanently waiving the requirement for management-prepared financial statements; and (e) waiving compliance with the LTV covenant.

27.     In particular, Centreville violated the representation and warranty set forth in Section 2(b) of the Participation Agreement by failing to notify Berkshire that the financial information that Centreville received from Shiva was misleading and incorrectly reported on

Shiva's tax returns. The Commercial Lending Annual File Update contains the following notes from Centreville:

> Management prepared income statements have been received for the 2017 and 2018 calendar years. This reports income and expenses that are unrelated to the construction/renovation that has been ongoing for three years. In 2017 the tax returns indicate roughly $5.4MM in cash operating expenses. A management prepared income statement reveals $3.35MM in operating expenses. This $2MM difference is what management and the CPA indicated *are value added capital improvements that are not labeled as such on the tax returns*. (emphasis added).

Upon information and belief, Centreville failed to recognize or alert Berkshire to materially false statements made on Shiva's tax returns. This information was known to, or should have been known to, Centreville at the time of the Participation Agreement but was not disclosed to Berkshire.

28. Further, Centreville violated the representation and warranty set forth in Section 2(e) of the Participation Agreement by failing to take all reasonable actions necessary to effect and maintain the perfection and priority of all liens and security interests granted in the Collateral as security for the Loan. Centreville failed to file and maintain a perfected security interest in the assets of the Corporate Guarantor Airport Hospitality, LLC.

29. Centreville violated Section 12(f) of the Participation Agreement by failing to obtain consent to modify or amend the DSCR and LTV covenants.

30. Upon information and belief, Shiva is in violation of both the DSCR and LTV covenants.

31. Centreville violated the notice and consent requirements of Sections 7 and 13 of the Participation Agreement by failing to inform Berkshire of these material adverse changes, Material Events of Default and Material Default Conditions and failing to secure its consent, such changes materially altering the rights and position of Berkshire under the Loan Documents.

32. Centreville violated Section 11 of the Participation Agreement by failing to abide by Berkshire's request that Centerville repurchase Berkshire's percentage of any outstanding principal and interest and late charges for the Loan in the event of a loss due to fraud or gross negligence on Centreville's part.

33. Centreville violated Section 1.4 of the Participation Agreement by failing to give the requisite advanced notice of the aggregate amount of the "Subsequent Advances (together with copies of all material requisition and supporting documentation given by Borrower to [Centerville] in connection therewith)."

34. Upon information and belief, in March 2020, Centreville violated Sections 2(e), 3.09, 6 and 12(f) of the Participation Agreement, failed to act in a commercially reasonable fashion and was grossly negligent by allowing, or failing to object to, Shiva and/or the Guarantors to contract with the State of Rhode Island and obtain rental payments for the hotel without any of that income being deposited at Centreville and being used to make payments pursuant to the Loan Documents and to pay Berkshire Bank pursuant to the Participation Agreement.

35. In short, Centreville breached the Participation Agreement by acting in a grossly negligent manner and failing to take prompt and commercially reasonable actions to protect the interests of Berkshire in response to the continuing and substantial defaults of Shiva and the Guarantors.

## COUNT I
**(Breach of Contract)**

36. Berkshire repeats and realleges each and every allegation contained in paragraphs 1 through 35 of this Complaint as if fully set forth herein.

37. Centreville has breached the Participation Agreement, including Sections 1.4, 2(b), 2(e), 3.09, 6, 7, 11, 12(f) and 13 of the Agreement.

38. As a result of Centreville's breach of the Participation Agreement, Berkshire has suffered and continues to suffer substantial damages including but not limited to the amount of its participation of $2.5 million.

## COUNT II
**(Breach of Covenant of Good Faith and Fair Dealing)**

39. Berkshire repeats and realleges each and every allegation contained in paragraphs 1 through 38 of this Complaint as if fully set forth herein.

40. Centreville's breach and failure to meet its obligations under the Participation Agreement constitute a breach of the implied covenant of good faith and fair dealing.

41. As a result of Centreville's breach, Berkshire has suffered substantial damages in an amount to be determined at trial.

WHEREFORE, Plaintiff Berkshire respectfully requests that the Court enter judgment in its favor and against Defendant Centreville, and grant the following relief:

1. An award of Berkshire's compensatory damages;

2. An award of Berkshire's attorneys' fees and costs pursuant to contract, statute and by law including but not limited to R.I. Gen. Laws § 9-1-45; and

3. Such other and further relief as the Court may deem just and proper.

                              Respectfully submitted,

                              Plaintiff BERKSHIRE BANK

                              By Its Attorneys,

                              */s/ David A. Wollin*
                              David A. Wollin (#4950)
                              Adam M. Ramos (#7591)
                              Hinckley Allen & Snyder LLP
                              100 Westminster Street, Suite 1500
                              Providence, RI  02903-2319
                              T:  (401) 274-2000
                              F:  (401) 277-9600
                              dwollin@hinckleyallen.com
                              aramos@hinckleyallen.com

Dated:  July 22, 2020

60031214